```
           UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF MISSOURI
                  EASTERN DIVISION


SHERRY DELALOYE,                )
                                )
           Plaintiff,           )
                                )
     v.                         )   No. 4:04 CV 1369 DJS
                                )                    DDN
JO ANNE B. BARNHART,            )
Commissioner of                 )
Social Security,                )
                                )
           Defendant.           )
```

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Sherry Delaloye for supplemental security income benefits based on disability under Title XVI of the Social Security Act, 42 U.S.C. § 1381, et seq. The action was referred to the undersigned United States Magistrate Judge for a recommended disposition under 28 U.S.C. § 636(b).

**BACKGROUND**

**A. Plaintiff's Application and Medical Records**

In an application for benefits dated October 16, 2001 (Tr. 69), plaintiff, who was born September 24, 1959, alleged a disability beginning November 26, 2000. Plaintiff alleged she suffers from carpal tunnel syndrome[1] in both hands, that her left foot had been numb for eight months, and that she suffers from sciatic nerve problems, shingles, and back problems. (Tr. 83.)

Plaintiff claims she stopped working due to pain in her foot and legs and back, and because she could not use her hands or sit for long

---

[1]Disorder which includes symptoms of tingling, numbness, weakness, or pain in the fingers, thumb, hand, and arm when there is pressure on the median nerve within the wrist. www.webmd.com/hw/carpal_tunnel/hw213311. (Last visited December 12, 2005).

periods of time. (Tr. 83.) She also alleges she has TMJ[2] in her jaw, making it "lock[] shut or open." (Tr. 90.)

Plaintiff had been employed as a substitute school bus monitor from 1995 to 1998; in that job she helped handicapped children get to school on the bus. She was required to walk for one hour and sit for four hours. The heaviest weight she lifted was less than ten pounds, and she lifted less than ten pounds frequently. (Tr. 97, 103.) From November 1999 to December 1999, she worked as a cook in a nursing home. She was required to stand and walk for eight hours each day. She was required to lift up to 50 pounds, and up to 25 pounds frequently. (Tr. 98.)

From September 2000 to November 2000, she worked as an invoicer. Her job requirements included working on a computer and invoicing produce that was ordered each day. She claims her carpal tunnel syndrome made it difficult to work on the computer. She was required to sit for five hours and write or type for two hours. She was required to lift less than ten pounds, and she lifted less than ten pounds frequently. (Tr. 99.)

Plaintiff claims her carpal tunnel syndrome makes it impossible for her to lift anything over five pounds, and that her numbness in her foot and legs makes her limp. These symptoms make her depressed, and are present daily. She attempts stretching exercises to alleviate the pain, and wears splints on her wrists, sometimes at night. She attempts to relax her jaw, but medication is the only thing that helps. (Tr. 104.)

---

[2]Temporomandibular Joint Disorder. TMJ is a disorder of the joint connecting the lower and upper jaw, resulting in possible headaches, clicking or popping noises when the mouth is opened or closed, pain, the jaw locking, and tender jaw muscles. http://www.webmd.com/content/article/103/107116.htm. (Last visited December 13, 2005).

Plaintiff was taking Tenex,[3] 2 milligrams once a day; Xanax,[4] 0.5 milligrams four times daily; Neurontin,[5] 300 milligrams four times daily; and Oxycontin,[6] 40 milligrams two times daily. (Tr. 104.) In an updated application, she reports taking Oxycontin, 60 milligrams twice daily; Lorcet[7] twice daily; Valium,[8] 10 milligrams three times daily; and Neurontin, 300 milligrams, four times daily. (Tr. 120.)

In answering a written questionnaire on April 16, 2001, plaintiff provided the following information. Plaintiff lives with a friend. In her daily activities, plaintiff can no longer garden or cut grass. Certain activities take much longer than before her symptoms occurred, and she can no longer run, walk for extended periods of time, or stand or sit for very long. She has problems sleeping, sometimes taking up to two hours to fall asleep. She reports eating muffins for breakfast, and attempts to help her friend cook dinner if she can, but if not, her friend cooks for her. She reports often needing help preparing meals due to an inability to lift heavy pots and pans. She takes a friend with her to shop because she is unable to lift heavy items. She does

---

[3]Tenex is used to treat high blood pressure. http://www.webmd.com/drugs/mono-8024-GUANFACINE+-+ORAL.aspx?drugid=7037&drugname=Tenex+Oral. (Last visited December 13, 2005).

[4]Xanax is used to treat anxiety and panic disorders. http://www.webmd.com/drugs/drug-9824-Xanax+Or al.aspx?drugid=9824&drugname=Xanax%20Oral. (Last visited December 12, 2005).

[5]Neurontin is used to treat seizures and to relieve nerve pain associated with shingles. http://www.webmd.com/drugs/mono-8217-GABAPENTIN+-+ORAL.aspx?drugid=9845&drugname=Neurontin+Oral. (Last visited December 12, 2005).

[6]Oxycontin is used to treat chronic moderate or severe pain. http://www.webmd.com/drugs/drug-2798-OxyContin+Oral.aspx?drugid=2798&drugname=OxyContin%20Oral. (Last visited December 12, 2005).

[7]Lorcet is a combination narcotic and acetaminophen used to treat mild to moderate pain. http://www.webmd.com/drugs/drug-57912-Lorcet+Oral.aspx?drugid=57912&drugname=Lorcet%20Oral. (Last visited December 12, 2005).

[8]Valium is used to treat axiety, acute alcohol withdrawl, and seizures. http://www.webmd.com/drugs/drug-11116- Valium+Oral.aspx?drugid=11116&drugname=Valium%20Oral. (Last visited December 12, 2005).

-3-

the laundry but other household chores require help from friends. She reports pain vacuuming and mopping. (Tr. 105-06.)

Plaintiff reported she enjoys watching television at night and meditating. She has difficulty reading but thinks that she may need glasses. She reports no trouble driving, although her hands "fall asleep" when she drives 10-15 miles. She drives short distances, like to the grocery store, once a week. She tries to leave her home at least once a day, to walk around the yard or to town to get something. Other days she just stays in bed or rests. When she does leave her home, she is gone one to two hours, to the store or to visit friends. (Tr. 106.)

On January 12, 1999, plaintiff saw Ken Smith, M.D., for x-rays. The doctor noted her right wrist, left wrist, and cervical spine all appeared normal. (Tr. 184.) On April 19, 1999, an x-ray of her left knee was normal. (Tr. 185.)

In April 1999, plaintiff had polyps removed from her colon by Dr. Steven Johnson. (Tr. 195-97.)

On March 25, 1999, plaintiff saw Edward Dumontier, M.D. He noted she experienced left hand and wrist pain. She also had a tender elbow and some ulnar nerve entrapment. Plaintiff did not want to see a surgeon. On April 19, 1999, Dr. Dumontier again examined plaintiff and noted she had fallen two days before the appointment. This fall left her with an injured knee, and with a decreased range of motion. He prescribed Xanax, which he refilled June 21, 1999. On June 23, 1999, plaintiff called Dr. Dumontier requesting Darvocet[9] for menstrual cramps. On July 22, 1999, plaintiff again saw Dr. Dumontier for low back pain and radiculopathy of the left leg. She requested a refill of the Darvocet on August 6, 1999. (Tr. 174-75.)

On September 20, 1999, plaintiff again saw Dr. Dumontier for pain in her left tooth. He referred her to a dentist. Plaintiff again requested a refill of Darvocet on November 12, 1999, for a cut finger. He refilled her prescription of Darvocet on December 2, 1999 and January 20, 2000. (Tr. 177-78.)

---

[9]Darvocet is a combination of narcotic and non-narcotic pain relievers used to treat mild to moderate pain. Webmd.com/drugs. (Last visited December 12, 2005).

On February 10, 2000, she went to Dr. Dumontier for back pain. He refilled her Darvocet prescription, and prescribed Trazodone.[10] Plaintiff complained of pain in her fingers. On March 8, 2000, she complained of hand numbness. The doctor noted it was possible nerve compression and possible carpal tunnel syndrome. He recommended no heavy lifting. On March 9, 2000, plaintiff called Dr. Dumontier requesting a prescription to help her sleep. Dr. Dumontier prescribed Remeron.[11] (Tr. 179.)

On March 10, 2000, plaintiff saw Dr. Dumontier. Plaintiff suffered from numbness in the hands, and had tenderness over her carpal tunnel. Dumontier noted the diagnosis was likely carpal tunnel syndrome, and put her in volar splints. (Tr. 180.) She called Dr. Dumontier on March 30, 2000, for a refill of Darvocet, but he noted he was not able to refill until April 4, 2000. (Tr. 181.)

On March 23, 2000, Dr. James M. Goldring reported his examination of plaintiff found evidence of bilateral carpal tunnel syndrome. (Tr. 199-201.)

Janet Sidebottom, a Nurse Practitioner (NP), examined plaintiff on October 20, 2000. Plaintiff appeared severely distressed, was crying, and near hysteria. NP Sidebottom assessed her as having severe anxiety and herpes simplex. She renewed her pain and anxiety medication. (Tr. 203.) On October 23, 2000, plaintiff called NP Sidebottom and requested Percocet;[12] she refused this request but approved different medication. (Tr. 204.)

On February 4, 2001, a Mental Residual Functional Capacity Assessment was performed by James Spencer, Ph.D. He opined plaintiff was not significantly limited in her ability to remember locations and

---

[10]Trazodone is used to treat depression. http://www.webmd.com/drugs/drug-11188-Trazodone+Oral.aspx?drugid=11188&drugname=Trazodone%20Oral. (Last visited December 12, 2005).

[11]Remeron is used to treat depression. http://www.webmd.com/drugs/mono-4047-MIRTAZAPINE+-+ORAL.aspx?drugid=13707&drugname=Remeron+Oral. (Last visited December 12, 2005).

[12]Percocet is used to treat moderate to severe pain. http://www.webmd.com/drugs/drug-7277-Percocet+Oral.aspx?drugid=7277&drugname=Percocet%20Oral. (Last visited December 12, 2005).

work-like procedures, understand and remember short and simple instructions, ability to carry out short and simple instructions, ability to perform activities within a schedule, maintain regular attendance, be punctual, ability to sustain an ordinary routine, work with others without being distracted, ability to make simple work related decisions, ability to complete work with consistent pace, ask simple questions, accept instructions, get along with coworkers, maintain socially appropriate behavior, respond appropriately to changes at work, be aware of hazards, and travel to unfamiliar places. (Tr. 308-09.) He opined she was moderately limited in her ability to understand and remember detailed instructions, carry out detailed instructions, and maintain attention and concentration for extended periods, act appropriately with the general public, and set realistic goals or make plans independently of others. (Tr. 308-09.) He concluded she could perform simple repetitive tasks which require little interaction with the public. (Tr. 310.)

On February 14, 2001, plaintiff was examined by NP Sidebottom, who found she had sciatica[13] and carpal tunnel syndrome. She returned on June 12, 2001, to schedule an MRI appointment, and NP Sidebottom accepted her complaints of leg paresthesia and chronic pain. (Tr. 208.) She saw NP Sidebottom again on July 10, 2001, following the MRI procedure, and was diagnosed with carpal tunnel syndrome, and disc disease. She complained on August 7, 2001, that the Oxycontin was not working, and NP Sidebottom noted she was consulting Dr. Mullen about plaintiff's pain medication use. (Tr. 210.)

On March 22, 2001, plaintiff saw Kenneth G. Mayfield, a licensed psychologist. He noted she appeared tense, anxious, and near tears. Her hands visibly shook and she had trouble making eye contact. He diagnosed her with a GAF 65.[14] He found she was able to care for her

---

[13]Sciatica is pain, tingling, or numbness due to an irritation of the sciatic nerve. Webmd.com. (Last visited December 12, 2005).

[14]Global Assessment of Functioning score of 65 means the plaintiff would have "[s]ome mild symptoms . . . OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." Diagnostic and Statistical Manual of Mental Disorders 34 (Fourth Ed.,

-6-

personal needs and able to understand verbal directions, but that her ability to concentrate was poor. Her ability to cope with stress was questionable. (Tr. 222-24.)

On April 30, 2001, plaintiff saw Richard M. Secor, D.O. He noted she suffered from chronic sacroilitis with recurrent sciatica, had a history of carpal tunnel syndrome, a history of anxiety and panic disorder, and well controlled hypertension. He recommended an exercise program, physical therapy, a discontinuation of narcotics, and orthopedic consultation. He opined her work ability was only limited by her recurring back pain. (Tr. 226-31.)

On June 14, 2001, psychologist Marsha J. Tall, Psy.D., found that plaintiff's medical impairments were not severe (Tr. 232), that her restriction on daily living activities, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence or pace were all "mild." (Tr. 242.)

On June 15, 2001, a Physical Residual Functional Capacity Assessment was prepared by counselor Shannon Rut on June 15, 2001. Plaintiff was found to be able to lift 20 pounds occasionally, 10 pounds frequently, stand or walk for 6 hours per day, and sit for 6 hours per day. Her ability to push or pull was unlimited. It was noted that her gait was unremarkable except for an exaggerated limp. It was further noted that she gave forth poor effort on her lower extremity tests. It was determined she could climb stairs, ramps, ladders, ropes, and scaffolds frequently, balance frequently, stoop occasionally, kneel frequently, crouch occasionally, and crawl frequently. It was noted her ability to stoop and crouch were limited due to her back pain. Her ability to feel was limited due to her carpal tunnel syndrome. It was found she was able to perform work associated with her residual functional capacity. (Tr. 247-51.)

On June 21, 2001, R.A. Murphy, D.O., examined plaintiff and found that she had degenerative disks at L4 and L5, but no herniation. (Tr. 254.)

---

2000).

On August 10, 2001, plaintiff saw Ralph Leigh, M.D. She complained of pain in her left toenail. She noted to the doctor that she had sciatic nerve pain. (Tr. 189-92.)

From August 1 to August 22, 2001, plaintiff visited a physical therapist. Plaintiff's subjective complaints included her left foot being numb and that the therapy did not improve her back pain. (Tr. 258-67.) Therapists Karen Murphy and others[15] noted that plaintiff fell asleep during exercises once, but otherwise tolerated the exercises well and was compliant. (Tr. 260.)

On or about December 8, 2001, plaintiff was involved in a roll-over motor vehicle collision. She did not seek medical attention at the time of the accident because she did not believe she was injured. (Tr. 268.)

A week after the accident, on December 15, 2001, Dr. John T. Schwent examined plaintiff and noted she had a history of pain medication abuse, and that she appeared to be in moderate discomfort. (Tr. 273.) On December 16, 2001, radiologist R.W. Templin noted plaintiff had a compression fracture of the L1 vertebra. (Tr. 276-77.)

On January 16, 2002, Marjorie Kuenz, Ph.D., examined plaintiff. Dr. Kuenz noted plaintiff had a GAF of 48.[16] Dr. Kuenz found that plaintiff could understand instructions, that her ability to sustain concentration and persistence in tasks was limited by her physical and depressive symptoms, and that she had little social functioning, but that could be improved with therapy. (Tr. 280-83.)

On February 4, 2002, Deena Eder performed a Physical Residual Functional Capacity Assessment, and found that plaintiff could lift 20 pounds occasionally, and 10 pounds frequently. She found plaintiff could stand or walk two hours in an eight-hour workday, sit with normal breaks for six hours in an eight-hour workday, and was unlimited in pushing or pulling. (Tr. 300-07.)

---

[15]Signatures of some of the physical therapists who treated plaintiff are unreadable. (See 258, 259, 261-264.)

[16]Global Assessment of Functioning score of 48 indicates "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning. . . ." Diagnostic and Statistical Manual of Mental Disorders 34 (Fourth Ed., 2000).

On February 6, 2002, David Mullen, D.O., diagnosed plaintiff with L1 and L2 compression fractures, chemical substance abuse, S/P metromenorrhgea, hyperlipidemia, osteoarthritis with degenerative changes in L4-5, low back pain with sciatica, and hypertension. He noted she was able to walk without a cane, sit, rise, stand without assistance, and carry a purse, that her fine motor skills in her hands were unrestricted, that she moved off and on the table without difficulty, that her speech and hearing were clear, and that her work status was only limited by chronic back pain with sciatic pain. (Tr. 220.)

When assessing her residual functional capacity, Dr. Mullen opined she could lift 20 pounds occasionally and 10 pounds frequently, that she could walk or stand for two hours in an eight-hour workday, and she could alternate sitting and standing to alleviate discomfort. He stated that she could not work for 40 hours a week, due to chronic back pain and sciatica. He noted she could work for six hours a day, 30 hours per week. (Tr. 220.)

By a letter dated January 28, 2003, David A. Mullen stated that plaintiff was currently disabled and unable to return to work at this time. (Tr. 312.)

On June 24, 2003, plaintiff underwent a physical examination, complaining of dark urine and back pain. (Tr. 339.) Her liver enzymes were elevated and she experienced nausea, which her doctor noted on July 16, 2003. (Tr. 339-46.)

On February 3, 2004, plaintiff was examined by John D. McGarry, M.D., a neurologist. He noted that plaintiff's neurological exam was normal, her spinal examination revealed a decreased range of motion, there was no objective evidence of carpal tunnel syndrome, and she had hypertension. He noted plaintiff complained of back pain, carpal tunnel syndrome, and shingles. She told him that her back pain required her to stay in bed three out of seven days a week. He noted she experienced leg numbness. He opined her L1 fracture was mild and should not be causing her pain, that her L4-5 disc dessication should not be causing her much discomfort, that there was no basis for the numbness in her leg

based on her MRI results, and that her carpal tunnel syndrome was mild, with no objective evidence of it. (Tr. 351-56.)

Dr. McGarry opined she could lift 25 pounds occasionally and 20 pounds frequently, that she could stand or walk for six hours in an eight-hour workday, that she could sit for six hours in an eight-hour workday, and that her ability to push and pull were limited to her upper extremities. He noted she could never climb, but could occasionally balance, kneel, crouch and crawl, and stoop. He determined she was unlimited in her ability to reach in all directions, handle, finger, and feel. He found she was unlimited in her ability to see, hear or speak. (Tr. 357-59.)

**B. Testimony of Claimant**

At a hearing held July 22, 2003, plaintiff testified she quit her job as invoice clerk because it was painful to sit. (Doc. 390.) She testified she is able to do laundry, take a bath, and do the dishes sometimes; otherwise, she sits, stands, and lays down throughout the day. (Tr. 393.) She is able to grocery shop with the help of her boyfriend. She testified her medication makes it difficult to drive. (Tr. 394.) She testified she needed help washing pots and pans but that she was able to personally care for herself. (Tr. 395-96.)

She testified she had numbness and pain in her leg and hands, and back pain. She wears a brace for a back injury she had in a car accident. (Tr. 398.) She testified she swam in the summer, and did not want to have surgery on her hands during the summer; she preferred that it was done during the winter. (Tr. 402-03.) She drives her son once a month to the psychiatrist, and testified she did not see one because she drives so much to doctor's appointments now. (Tr. 406.) She testified that for six months, she had been taking one Xanax tablet four times a day, and before that, for the previous ten years, she had been taking one three times a day. (Tr. 410.) She testified she had knee pain. (Tr. 412-13.) She cries three or four times per week. (Tr. 414.)

## C. Testimony of Vocational Expert

Vocational expert Brenda Young testified at the hearing July 22, 2003. She was presented with this hypothetical question:

> If we would assume a hypothetical individual of Miss Delaloye's age, education and work experience, and assume that that hypothetical individual would be limited to lifting . . . 20 pounds occasionally, ten pounds frequently. Would be able to stand and/or walk about six hours in an eight-hour work day and be able to sit at least six hours in an eight-hour work day and would have to, could only occasionally stoop and crouch. And would have some limitation with fine fingering but no gross problems, no gross manipulation problems . . . . And the person would be limited to simple and/or repetitive type work with no close interaction with the general public.

(Tr. 416-17.) Young testified the hypothetical individual could do light dining room help, and light janitorial work. Young opined there were 15,000 jobs in this area. She opined, however, that if the claimant had a GAF of 48, due to major depressive disorder, she would not be able to work. She also testified that, if the claimant was limited to six hour days, she would not be able to work full-time. She further opined that poor concentration would still enable the hypothetical person to perform some simple, repetitive tasks. (Tr. 417-18.)

## D. Findings of the ALJ

In a decision denying benefits on May 7, 2003, the ALJ determined that the medical evidence showed plaintiff had a L4/L5 disc desiccation, a history of compression fracture of the L1, mild carpal tunnel syndrome, well-controlled hypertension, a history of anxiety, and a history of depression. (Tr. 24.) The ALJ found these impairments, in combination, were considered "severe" but did not equal one of the listed impairments in 20 CFR § 416.920(b).

The ALJ discounted the opinion of Dr. Mullen, stating that his assessment of plaintiff occurred shortly after the L1 compression fracture and therefore was not useful in assessing plaintiff's long-term limitations. The ALJ found that the plaintiff's allegations regarding her impairments were not entirely credible. The ALJ noted that chemical substance abuse was diagnosed in 2002. (Tr. 20.)

-11-

The ALJ found that plaintiff had the RFC to perform the exertional and nonexertional requirements of work with some limitations. The ALJ found that plaintiff could lift only 20 pounds occasionally and only 10 pounds frequently. The plaintiff could stand and walk for six hours in an eight-hour workday. The claimant could sit for six hours in an eight-hour workday. The claimant could occasionally crouch and stoop, and she is limited to performing simple or routine tasks with limited contact with the general public. (Tr. 24.)

The ALJ found that, although plaintiff had limited education and no transferrable skills from any past work, she had the RFC to "perform a significant range of light work." Such jobs included dining room helper and light office cleaner. Therefore, the plaintiff was found not to be disabled.

## II. DISCUSSION

**A. General legal framework**

The court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id.; accord Jones v. Barnhart, 335 F.3d 697, 698 (8th Cir. 2003). In determining whether the evidence is substantial, the court must consider evidence that detracts from, as well as supports, the Commissioner's decision. See Brosnahan v. Barnhart, 336 F.3d 671, 675 (8th Cir. 2003). So long as substantial evidence supports the final decision, the court may not reverse merely because opposing substantial evidence exists in the record or because the court would have decided the case differently. See Krogmeier, 294 F.3d at 1022.

To be entitled to benefits on account of disability, a claimant must prove that she is unable to perform any substantial gainful activity due to any medically determinable physical or mental impairment, which would either result in death or which has lasted or could be expected to last for at least 12 months. See 42 U.S.C. § 1382c(a)(3)(A) (2004). A five-step regulatory framework governs the evaluation of disability in

general. See 20 C.F.R. § 416.920 (2003); see also Bowen v. Yuckert, 482 U.S. 137, 140-41 (1987) (describing the framework); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir. 2003). If the Commissioner can find that a claimant is or is not disabled at any step, a determination or decision is made and the next step is not reached. 20 C.F.R. § 416.920(a)(4).

Step One asks whether the claimant is working and whether the work is "substantial gainful activity." 20 C.F.R. § 416.920(b). If so, disability benefits are denied. 20 C.F.R. § 416.920(b). If the claimant is not working, Step Two asks whether she has a "severe impairment," i.e., an impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities. 20 C.F.R. § 416.920(c). If she does not have a severe impairment or combination of impairments, the disability claim is denied. 20 C.F.R. § 416.920(c). If the impairment is severe, Step Three asks whether the impairment is equal to an impairment listed by the Commissioner as precluding substantial gainful activity. 20 C.F.R. § 416.920(d). "If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled." Bowen, 482 U.S. at 141. If the impairment is not one that meets or equals one of the listed impairments, Step Four asks whether the impairment prevents the claimant from doing work she has performed in the past. 20 C.F.R. § 416.920(e). To determine whether a claimant can perform her past relevant work, the ALJ assesses and makes a finding about the claimant's RFC based on all the medical and other evidence in the case record. 20 C.F.R. § 416.920(e); see 20 C.F.R. § 416.945(a)(1) (2003) (RFC is the most a claimant can do despite her limitations).

Here, the ALJ determined plaintiff could not perform any past relevant work. (Tr. 23.) Therefore, the inquiry is whether plaintiff can perform any other relevant work in the national economy, Step Five. See 20 C.F.R. § 416.920(g)(1). On Step Five the burden shifts to the Commissioner. Bladow v. Apfel, 205 F.3d 356, 359 n.5 (8th Cir. 2000).

**B. Residual Functional Capacity**

Plaintiff argues that the ALJ erred when determining her residual functional capacity. Specifically, she argues he wrongly discredited the

-13-

opinion of Dr. Mullen, her treating physician, the opinion of Dr. Marjorie Kuenz, a psychologist, and the opinion of Dr. Mayfield.

The RFC is "the most [a claimant] can still do despite" his or her "physical or mental limitations." 20 C.F.R. § 404.1545(a). When determining plaintiff's RFC, the ALJ must consider "all relevant evidence" but ultimately the determination of the plaintiff's RFC is a medical question. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). As such, the determination of plaintiff's ability to function in the workplace must be based on some medical evidence. Id.; see also Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).

The ALJ found plaintiff's impairments limited her RFC as follows:

> The claimant can lift 20 pounds occasionally and 10 pounds frequently. The claimant can stand and/or walk about six hours in an 8-hour workday. The claimant can sit about six hours in an 8-hour workday. The claimant can occasionally crouch and stoop. The claimant is limited to performing simple and or routine tasks with limited contact with the general public.

(Tr. 22-23.) The ALJ relied primarily on Dr. McGarry's assessment of plaintiff, noting that he was a neurological specialist and therefore his opinion was afforded more weight. The ALJ noted that Dr. McGarry's assessment was consistent with Dr. Mullen's assessment except for the hours per week the plaintiff could work. (Tr. 23.)

When determining the RFC, "[t]he opinions of the claimant's treating physicians are entitled to controlling weight if they are supported by and not inconsistent with the substantial medical evidence in the record." Stormo v. Barnhart, 377 F.3d 801, 805 (8th Cir. 2004). "Such opinions are given less weight if they are inconsistent with the record as a whole or if the conclusions consist of vague, conclusory statements unsupported by medically acceptable data." Id.; Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). "By contrast, '[t]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence.'" Singh, 222 F.3d at 452 (quoting Kelley v. Carnahan, 133 F.3d 583, 589 (8th Cir. 1998)). The ALJ must set forth his reasons for the weight given to a treating physician's assessment. Singh, 222 F. 3d at 452. Specialists' opinions are entitled

to greater weight than the opinion of a source who is not a specialist. Id.

The ALJ stated that he discounted the February 2, 2002, findings of Dr. Mullen, because that assessment was given right after plaintiff suffered a spinal fracture and did not assess her long-term limitations. (Tr. 20.) Defendant argues that the disability letter written by Dr. Mullen on January 28, 2003, was merely conclusory and did not contain any objective findings. (Doc. 15 at 14.)

The disability finding by Dr. Mullen was properly discredited. "A medical source opinion that an applicant is 'disabled' or 'unable to work,' . . . involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005); Browning v. Sullivan, 958 F.2d 817, 823 (8th Cir. 1992). As noted by the defendant, Dr. Mullen's disability opinion is entirely conclusory. Stormo, 377 F.3d at 805.

Dr. Mullen's RFC findings were also properly compared with that of Dr. McGarry and were properly discredited. The ALJ noted that the RFC determined by Dr. Mullen and that determined by Dr. McGarry were identical except for the hours plaintiff could work during the week. (Tr. 23); see also Ellis, 392 F.3d at 994 (opinions of treating and consulting physicians were similar except for time she could sit or stand, and ALJ gave treating physician's opinion some weight). Further, Dr. McGarry was a neurologist, and the ALJ can give the opinion of a specialist in the field greater weight. Singh, 222 F.3d at 452.

Plaintiff argues that the Commissioner failed to recontact Dr. Mullen to develop the record. (Doc. 12 at 4.) Defendant argues that plaintiff has not shown what records would have been obtained from Dr. Mullen had the ALJ more fully developed the record, and therefore, plaintiff has shown no prejudice by this omission. (Doc. 15 at 13.) The ALJ has a duty to fully develop the record. Ellis, 392 F.3d at 994. However, "that duty arises only if a crucial issue is underdeveloped." Id. Like Ellis, plaintiff here has not stated what medical information is missing from the record. See id. Therefore, she has failed to show

that the ALJ's failure to recontact her treating physician has resulted in any improper prejudice to her.

Plaintiff also argues that the ALJ failed to consider the psychological evaluations performed by Dr. Kuenz and Dr. Mayfield. (Doc. 12 at 11-13.) Dr. Kuenz evaluated plaintiff on January 19, 2002, and opined she had a GAF of 48. (Tr. 283.) The ALJ discredited her opinion that plaintiff was significantly limited in her ability to concentrate and be persistent with tasks, because she attributed this to not only depressive symptoms but also physical symptoms, about which she has no expertise. The record does not indicate that Dr. Kuenz had the expertise to support her findings that plaintiff's inability to concentrate was due to physical symptoms. See Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993) (doctor performed no tests to support his conclusion). Further, the ALJ noted that Dr. Kuenz found that plaintiff's condition would likely improve with therapy. Also, Dr. Kuenz's opinion was inconsistent with that of Dr. Mayfield, who assessed plaintiff with a GAF of 65.

Dr. Mayfield found that plaintiff's ability to sustain concentration and attention was poor, and that her ability to cope with stress and work activities was questionable. (Tr. 21, 224.) However, he then assigned her a GAF of 65, which indicates mild symptoms or some difficulty in social, occupational, or school functioning. (Tr. 222-25.) The ALJ determined these findings were inconsistent. The undersigned agrees. When a treating physician's opinion is internally inconsistent, the ALJ does not have to afford it great weight. Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005). Dr. Mayfield noted plaintiff seemed primarily concerned with physical health problems. (Tr. 223.) He found her ability to relate to others was intact and that she was able to understand directions.

Substantial evidence in the record supports the ALJ's discrediting of some of the opinions of plaintiff's treating physicians and the RFC attributed to plaintiff.

### C. Subjective Complaints

Plaintiff also argues that the ALJ did not consider her subjective complaints when determining she was not disabled, and did not properly

evaluate her credibility. "The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians . . . ." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Factors to be considered include the claimant's daily activities, the duration, frequency, and intensity of the pain, any precipitating factors, whether the claimant has been taking pain medication and the dose, and functional restrictions. Id.; Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003). The ALJ may not discredit subjective complaints based solely on personal observation. Polaski, 739 F.2d at 1322. "Subjective complaints may be discounted if there are inconsistencies in the record as a whole." Singh, 222 F.3d at 452. "An ALJ who rejects such complaints must make an express credibility determination explaining the reasons for discrediting the complaints." Id.

Plaintiff argues that the ALJ did not consider her daily activities when determining her RFC, and instead relied solely on the medical records. (Doc. 12 at 14.) The ALJ considered plaintiff's testimony about her limited daily activities. However, these activities were limited by her own choosing, not by the directions of a doctor. (Tr. 22.) The record reflects that the ALJ considered plaintiff's daily activities of watching television, reading, and similar activities required concentration which refuted the medical evidence that she was unable to concentrate. (Tr. 22.)

The ALJ explained the reasons for discrediting some of plaintiff's complaints. The ALJ noted her complaints of carpal tunnel syndrome were not persistent, and were often noted only as history in her records. The ALJ noted plaintiff never sought surgery for the condition. (Tr. 18.) Dr. Mullen noted her fine motor function in her hands was unlimited. (Tr. 18.) Neurologist Dr. McGarry noted there was no objective evidence of carpal tunnel syndrom. Dr. Secor indicated a history of carpal tunnel syndrome but found plaintiff had normal grip strength. (Tr. 18.) The ALJ properly saw that the medical record indicated no limitations of gross or fine motor skills. The inconsistencies in the record as a whole

as to the extent of her condition are factors the ALJ could consider when discrediting some of her complaints. Singh, 222 F.3d at 452.

Plaintiff's persistent use of pain medication is also substantial evidence supporting the ALJ's discrediting plaintiff's subjective complaints. It is true plaintiff took a significant amount of strong pain medication. However, the ALJ noted that it appeared plaintiff suffered from chemical substance abuse, and this determination was supported by Dr. Mullen's opinion that plaintiff suffered from drug abuse. (Tr. 220.) The record indicates that at times, doctors refused to refill plaintiff's prescription pain killers because she used the medication faster than they were willing to refill them. (Tr. 181, 204.) While persistent pain medication use is indicative of disabling pain, here plaintiff's use of pain medication was discredited by what her own treating physician considered drug seeking behavior. Further, no doctor placed any restrictions on her daily activities beyond no heavy lifting. (Tr. 179.) Plaintiff never sought surgery for her carpal tunnel syndrome, because she did not want it to interfere with her activities. (Tr. 402-03.) There is substantial evidence on the record for the ALJ to discredit some of plaintiff's subjective complaints.

**D. Vocational Expert**

Plaintiff also argues that the hypothetical question posed to the vocational expert was based on a flawed RFC, and, therefore, should not be considered substantial evidence supporting the conclusion she is not disabled. A hypothetical question to a vocational expert must precisely describe a claimant's impairments, as found by the ALJ, so that the expert may accurately assess whether jobs exists for her. Newton v. Chater, 92 F.3d 688, 694-95 (8th Cir. 1996); see Pierce v. Apfel, 173 F.3d 704, 707 (8th Cir. 1999) (a proper hypothetical presents to the vocational expert a set of limitations that mirror those of the claimant); Totz v. Sullivan, 961 F.2d 727, 730 (8th Cir. 1992). It "must capture the concrete consequences of claimant's deficiencies." Pickney v. Chater, 96 F.3d 294, 297 (8th Cir. 1996).

As stated above, the RFC found by the ALJ was not in error as there was substantial evidence to support it. Therefore, the hypothetical

question upon which the vocational expert based her opinion was not improper.

## RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed under Sentence 4 of 42 U.S.C. § 405(g).

The parties are advised that they have ten (10) days in which to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

_____
**DAVID D. NOCE**
**UNITED STATES MAGISTRATE JUDGE**

Signed on January 5, 2006.